**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

UNITED STATES OF AMERICA *ex rel.* AIDAN K. PETERS,

      Relator and Plaintiff,

           v.

PERDOCEO EDUCATION CORPORATION, a Delaware corporation;
COLORADO TECHNICAL UNIVERSITY, INC., a Colorado corporation;
CEC EMPLOYEE GROUP, LLC, a Delaware limited liability company; and
DOES 1-500, Inclusive,

      Defendants.

---

COMPLAINT UNDER THE FALSE CLAIMS ACT

JURY TRIAL DEMANDED

---

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................3

II.     JURISDICTION AND VENUE...........................................................................5

III.    PARTIES...............................................................................................................5

IV.     FEDERAL FALSE CLAIMS ACT......................................................................9

V.      TITLE IV OF THE HIGHER EDUCATION ACT OF 1965 .....................11

VII.    DEFENDANT SCHOOLS' FALSE CLAIMS WERE MATERIAL...........................72

VIII.   CTU ACTED WITH THE REQUIRED KNOWLEDGE: SCIENTER....................80

IX.     CTU'S SUBMISSION OF FALSE CLAIMS CAUSED DAMAGE TO THE US GOVERNMENT .................................................................................................83

X.      CTU VIOLATED THE FALSE CLAIMS ACT'S ANTI-RETALIATION PROVISION. ......................................................................................................86

XI.     CLAIMS FOR RELIEF........................................................................................88

XII.    JURY TRIAL DEMAND......................................................................................94

Relator and Plaintiff Aidan Peters ("Relator"), on behalf of himself and the United States of America, complains as follows:

## I.    **<u>INTRODUCTION</u>**

1.      When Congress established federal student loan and grant programs to help students attend college, it imposed a number of important legal requirements on colleges and universities that receive such funding in order to ensure that the billions of dollars that taxpayers invest in higher education each year are spent wisely.

2.      The claims set forth below arise from the conduct of defendants Perdoceo Education Corporation (formerly known as Career Education Corporation), and its wholly owned subsidiary, Colorado Technical University, Inc. (collectively, "CTU or "Defendant Schools"), which is a violation of the federal False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA").

3.      Defendant Schools knowingly presented and made, or caused to be presented and made, false claims and statements that were material to their receipt of funding from federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070, et seq. ("Title IV programs"). Title IV programs, which are administered by the United States Department of Education ("Department of Education"), provide students with financial aid in the form of, among other things, federal Pell

Grants, federal direct student loans, and loans guaranteed by the federal government.

4.    Defendant Schools violated numerous legal requirements under Title IV but repeatedly certified to the Department of Education that they were fully complying with the applicable legal standards. In particular, Defendant Schools certified their compliance with the Incentive Compensation Ban and the Misrepresentation Ban in order to obtain billions of dollars from Title IV programs.

5.    Defendant Schools' violations of these two legal requirements were widespread and systematic—they were part of the fabric of Defendant Schools' business practices. And Defendant Schools' thousands of false certifications of compliance with these legal requirements led directly to the impermissible payments received by Defendant Schools.

6.    From at least June 2016 to the present, Defendant Schools knowingly submitted, or caused to be submitted, tens of thousands of claims for payment to the Department of Education based on material false certifications and statements. During the same period, Defendant Schools fraudulently induced the Department of Education into granting Defendant Schools eligibility to participate in Title IV programs when, in fact, Defendant Schools were ineligible to participate in those programs and knew that they intended to continue the practices that made them so ineligible.

7.      During the periods covered by this Complaint, Defendant Schools obtained hundreds of millions of dollars in federal funds through Title IV programs that they were not eligible to receive. Because Defendant Schools were not eligible to receive these funds, the students attending the schools were also ineligible to receive any funds from Title IV programs.

## II.    **JURISDICTION AND VENUE**

8.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§ 3730, 3732.

9.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because CTU transacts business or is found in this District and because acts proscribed by 31 U.S.C. § 3729 occurred in this District.

10.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a).

## III.    **PARTIES**

### A.    **Plaintiffs**

11.     Relator Aidan Peters is presently a resident and citizen of the State of Illinois.

12.     From June 21, 2016, until November 30, 2020, Relator was employed by Colorado Technical University ("CTU") through CEC Employee Group, LLC, as an online admissions advisor—a student recruiter.

13.    In his position at Defendant Schools, Relator learned of Defendant Schools' practices regarding a number of important legal requirements and restrictions. At their request, Relator has shared his experiences working at Defendant Schools with congressional staff, investigators with the U.S. Department of Education, the Attorney Generals of Illinois and New York, and the Federal Trade Commission, among others.

14.    Relator brings this action for violations of the federal FCA on behalf of himself and the United States of America. Relator, through his work for Defendant Schools, has personal knowledge of the false records, statements, and claims presented to the government by and for the Defendant Schools named herein.

15.    As required under the FCA, 31 U.S.C. § 3730(b)(2), Relator will provide the United States Attorney and the United States Attorney General with written disclosures of substantially all material evidence and information supporting the allegations herein.

16.    Relator is an "original source" as that term is defined in the FCA. 31 U.S.C. § 3730(e)(4)(B). Relator has independent, material, and first-hand knowledge of the information on which the allegations of fraudulent misconduct are based. Relator voluntarily provided such information to investigators at the U.S. Department of Education (among others), including

through videoconferences and a sworn declaration in May and July, 2021, respectively.

17.    The United States of America is named as a plaintiff because funds of the United States of America were (and are) awarded and paid to Defendant Schools in connection with Title IV programs, which payments are the result of the false claims alleged in this Complaint.

### B.    **Defendant Schools**

18.    Perdoceo Education Corporation ("Perdoceo"), formerly known as Career Education Corporation ("CEC"), is Delaware corporation with its principal place of business in Schaumburg, Illinois. Colorado Technical University, Inc., is a wholly owned subsidiary of Perdoceo.

19.    Perdoceo, through these various subsidiaries, operates a number of for-profit colleges at physical campuses throughout the country and also through online degree programs. Perdoceo directs and controls the actions of its subsidiaries, which, on information and belief, are nothing more than passive holding companies.

20.    Colorado Technical University, Inc., is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Colorado Technical University operates two campuses in Colorado, but the bulk of its students are served through its online courses and are therefore disbursed

nationwide. Colorado Technical University is a wholly owned subsidiary of Perdoceo.

21.    Relator is informed and believes, and thereupon alleges, that Colorado Technical University does not have independent management but is instead governed, directed, controlled, and managed by its parent company, Perdoceo.

22.    As of June 2016, Colorado Technical University was operating on provisional, month-to-month program participation agreement since its permanent program participation agreement expired in 2011.

23.    In May 2019, Colorado Technical University received a renewal of its program participation agreement through March 31, 2021, which removed Colorado Technical University from provisional certification. Colorado Technical University applied for a new program participation agreement in December 2021 and continues to await the Department of Education's decision. On information, Colorado Technical University remains on a month-to-month basis under its old program participation agreement until the Department acts on its currently pending application.

24.    During the periods relevant to this Complaint, Defendant Schools have received, and continue to receive, a substantial portion of their revenues from funds provided through Title IV programs.

25.   The terms "CTU" and "Defendant Schools" will refer to the defendants identified herein acting by and through their managerial employees.

26.   At all times material to this Complaint, Perdoceo (fka Career Education Corporation) and Colorado Technical University, Inc., have operated as a common enterprise while engaging in the deceptive and abusive acts and practices alleged below. Perdoceo has conducted the business practices described below through an interrelated network of companies that have common ownership, business functions, employees, and office locations. Because these defendants have operated as a common enterprise, they are jointly and severally liable for the acts and practices alleged below.

27.   Managerial employees of Defendant Schools, in doing the acts and things described in this Complaint, were acting within the course and scope of their respective agencies and/or employment with Defendant Schools, and each of them, with the knowledge and consent of the Defendant Schools, and each of them, unless otherwise indicated.

## IV.   **FEDERAL FALSE CLAIMS ACT**

28.   For violations occurring on or after May 20, 2009, the false claims provision of the FCA, at 31 U.S.C. § 3729(a)(1)(A) (2009), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides in pertinent part that any person who "knowingly presents, or causes to be presented, a false or

fraudulent claim for payment or approval" shall be liable to the United States Government.

29.    The FCA defines the term "claim" to mean

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A) (2009).

30.    As amended by FERA, the false statements provision of the FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

31.    The FCA, as amended by FERA, defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4) (2009).

32.    The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the

information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(B) (2009).

## V. **TITLE IV OF THE HIGHER EDUCATION ACT OF 1965**

### A. **The General Provisions of the Higher Education Act and Related Regulations.**

33. Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070, *et seq.*, Congress established various student loan and grant programs, including but not limited to the Federal Pell Grant Program ("Pell Grant program"), the Federal Family Education Loan Program ("FFELP"),[1] and the Federal Direct Loan Program ("FDLP") (collectively "Title IV funding") in order to financially assist eligible students to obtain a post-secondary education.

34. Although the mechanism by which Title IV funding is disbursed to eligible students under the Title IV programs varies by program, each Title IV program requires compliance with specific conditions and obligations, and certification of compliance with such conditions and obligations, as a prerequisite to obtaining Title IV funding. As Perdoceo has acknowledged, "[t]o be eligible to participate in Title IV Programs, an institution must comply with

---

[1] No new loans were made under FFELP after July 1, 2010.

the Higher Education Act and regulations thereunder that are administered by" the Department of Education.

35. In order to become eligible to receive Title IV funding under programs such as the Pell Grant program or FDLP, or to have their students receive Title IV funding, schools must first complete the Department of Education's Application for Approval to Participate in the Federal Student Financial Aid Programs. Additionally, schools must periodically re-certify their participation in the Title IV programs and must submit an application during the recertification process.

36. In the Application for Approval to Participate in the Federal Student Financial Aid Programs, the president, CEO, or chancellor of each school must

> certify that, to the best of my knowledge and belief, all information in this document is true and correct. I understand that if my institution provides false or misleading information, (a) the U.S. Department of Education may deny the institution's request for eligibility to participate in federal student financial aid programs and/or revoke eligibility once it has been granted and (b) the institution may be liable for all federal student financial aid funds it or its students received.

37. Once a school's application to participate in Title IV programs is accepted, and before it receives any funds, it must first enter into a program participation agreement ("PPA") with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14.

38. Each PPA expressly conditions a school's initial and continuing eligibility to receive funds under Title IV programs on compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

39. Often, as here, when a PPA expires—but before the school can be fully re-certified and receive a final PPA—the Department will grant a school a provisional, month-to-month PPA.

**B.      The Incentive Compensation Ban bars schools that receive Title IV funding from paying recruiters any form of incentive compensation.**

40. Section 487(a)(20) of Title IV of the HEA explicitly requires that in order to receive Title IV funding, schools must "not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20) ("Incentive Compensation Ban" or "ICB"). Title IV of the HEA expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools comply with the Incentive Compensation Ban and certify such compliance in numerous ways.

41. The Department of Education's regulations further reiterate that schools must comply with the Incentive Compensation Ban in order to be eligible to receive Title IV funding and that schools must expressly agree to the

Incentive Compensation Ban in PPAs. 34 C.F.R. § 668.14(b)(22) ("Incentive Compensation Regulations").

42. In each PPA, a school certifies that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV Program." The PPA further states that a school's participation in Title IV programs is "subject to the terms and conditions set forth in this Agreement." (*Id.*)

43. The PPA provides, among other things, that

> [b]y entering into this Program Participation Agreement, the Institution agrees that . . . (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . . .

This certification is a critical prerequisite for a school's eligibility to request and receive Title IV funding.

44. Congress enacted the prohibition against paying commissions, bonuses, or other incentive payments based on success in recruiting students because such payments were associated with high loan default rates, which in turn resulted in a significant drain on program funds. When Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, including the payment of incentive

14

compensation to motivate admissions personnel to enroll students without regard to the students' ability to benefit from the education. S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

45. Following a high-profile investigation of the abuses of for-profit schools starting in 2010, the U.S. Senate committee with oversight responsibility acknowledged that systemic fraud and abuse continues unabated among for-profit colleges. S. Comm. on Health, Education, Labor, and Pensions, 112th Cong., For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success (Comm. Print July 30, 2012).

46. This followed a scathing report by the U.S. General Accounting Office in 2010 that found similar widespread abuses by for-profit colleges relating to incentive compensation and misrepresentations by improperly incentivized recruiters. General Accounting Office, For-Profit College: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (GAO-10-948T), August 4, 2010.

47.    In light of these investigations and findings, in June 2010, the Department of Education proposed substantial revisions to the Incentive Compensation Regulations. The Department explained that the proposed revisions were necessary because "the Department's experience demonstrates that unscrupulous actors routinely rely upon [perceived ambiguities in the existing regulations] to circumvent the intent of section 487(a)(20) of the HEA." Incentive Compensation (§ 668.14(b)), 75 Fed. Reg. 34816, 34817 (June 18, 2010). The Department concluded that "rather than serving to effectuate the goals intended by Congress through its adoption of section 487(a)(20) of the HEA, the [existing regulations] have served to obstruct those objectives." *Id.*

48.    The Department of Education promulgated final regulations revising the Incentive Compensation Regulations on October 29, 2010, effective July 1, 2011. Program Integrity Issues, 75 Fed. Reg. 66832, 66832 (Oct. 29, 2010); 34 C.F.R. § 668.14(b)(22) (2011).

49.    Effective July 2011, the Incentive Compensation Regulations provide that "Commission, bonus, or other incentive payment means a sum of money or something of value, other than a fixed salary or wages, paid to or given to a person or an entity for services rendered." 34 C.F.R. § 668.14(b)(22)(iii)(A) (2011) (emphasis added).

50.    The Incentive Compensation Regulations further define what activities are considered "securing enrollments or the award of financial aid"

16

under the statute. It includes any activity "that a person or entity engages in at any point in time through completion of an educational program for the purpose of the admission or matriculation of students for any period of time or the award of financial aid to students." 34 C.F.R. § 668.14(b)(22)(iii)(B).

51.     The regulations further emphasize the broad nature of this definition: "These activities include contact in any form with a prospective student, such as, but not limited to—contact through preadmission or advising activities, scheduling an appointment to visit the enrollment office or any other office of the institution, attendance at such an appointment, or involvement in a prospective student's signing of an enrollment agreement or financial aid application." 34 C.F.R. § 668.14(b)(22)(iii)(B)(1) (emphasis added).

52.     In its March 2011 "Dear Colleague Letter" explaining the regulatory changes, the Department of Education provided additional guidance on what types of activities run afoul of the Incentive Compensation Ban. Although obvious from the text of the Ban itself, the Department's Dear Colleague Letter underscored that "[s]alary adjustments that take the form of incentive payments based directly or indirectly on success in securing enrollments of financial aid" is a "[t]ype of payment" that violates the Incentive Compensation Ban.

**C.**   **The Misrepresentation Ban bars schools receiving Title IV funds from making any material misrepresentations about the school's programs and other aspects.**

53.   In Title IV to the Higher Education Act, Congress declared in no uncertain terms that the Secretary of the Department Education should consider "suspend[ing] or terminat[ing]e the eligibility status" of any school that that engages in any "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 20 U.S.C. § 1094(b)(3)(A).

54.   In addition to substantial revisions to the Incentive Compensation Ban regulations in 2010, in response to the GAO report and Senate investigation, the U.S. Department of Education also proposed a package of new rules to enforce the statute prohibiting schools receiving federal funds from making any substantial representations about their programs, charges, or graduate employment.

55.   Indeed, in June 2010, the Department of Education announced wholesale revisions to the misrepresentation rule because the Department had "receive[d] complaints from students who allege that they were the victims of false promises and other forms of deception when they were considering their postsecondary educational opportunities" and the new rules were needed to "help[] students to make sound decisions regarding their educational pursuits is essential to maintaining the integrity of the title IV, HEA programs."

Misrepresentation (Subpart F of Part 668), 75 Fed. Reg. 34816, 34834 (June 18, 2010). Final rulemaking on the current Misrepresentation Ban occurred in October 2010 (75 Fed. Reg. 66832 (Oct. 29, 2010)), with the final rule codified at 34 C.F.R. § 668.71–74. (Minor changes were made to the rule following a legal challenge. *See Ass'n of Priv. Sector Colleges & Universities v. Duncan*, 681 F.3d 42 (D.C. Cir. 2012).)

56. The Misrepresentation Ban provides that a school has "engaged in substantial misrepresentation when the institution itself, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, marketing, advertising, recruiting or admissions services, makes a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 688.71(b).

57. The Misrepresentation Ban prohibits "[s]ubstantial misrepresentations . . . all forms, including those made in any advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution." *Id.*

58. The Misrepresentation Ban defines the applicable terms broadly to capture all forms of misrepresentations about anything relating to the program, charges, or employability of graduates.

59. It defines "misrepresentation" as

19

[a]ny false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to mislead under the circumstances. A statement is any communication made in writing, visually, orally, or through other means. Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading. Misrepresentation includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required the student to make such an endorsement or testimonial to participate in a program.

34 C.F.R. § 668.71(c).

60.    A "Substantial misrepresentation" is defined as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.*

61.    In the same March 2011 "Dear Colleague Letter," the Department of Education explained that the Misrepresentation Ban regulations do not create a new private right of action on behalf of students. Instead, the Misrepresentation Ban "regulations are intended to make sure that institutions are on notice that the Department believes that substantial misrepresentations constitute a serious violation of an institution's fiduciary duty" towards the Department in its

handling of Title IV funds. In other words, a violation of the Misrepresentation Ban is a material violation of a school's obligations and duties to the Department under Title IV.

### D.    **Management Certification Requirement.**

62.    To maintain its eligibility to receive Title IV funding, each year that a school participates in any Title IV program, the school also must provide the Department of Education with an annual compliance audit of its administration of Title IV programs, as well as an audit of the school's general purpose financial statements, prepared by independent auditors. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23(a)(2), (a)(4). For-profit educational institutions, such as Defendant Schools, must conduct their annual financial statements and compliance audits in accordance with the Department of Education Office of Inspector General's Audit Guide.

63.    The Department of Education relies, in part, on the compliance and financial statements audits, undertaken for its benefit, to determine whether schools receiving Title IV funding are adhering to applicable requirements for Title IV programs, including the Incentive Compensation and Misrepresentation Bans, and whether to allow the schools to continue receiving funds from Title IV programs.

64.    As part of the annual audits, Defendant Schools are required to certify to the Department's third-party auditor that they are complying with the

requirements for eligibility to participate in Title IV programs, including the Incentive Compensation Ban. (*See* Department of Education Audit Guide ("Audit Guide") (2016) at 67–69.) Specifically, Defendant Schools must certify they have "[n]ot paid to any persons *or entities* any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention [34 C.F.R. § 668.14(b)(22)]." (*Id.* (emphasis added).)

65.    Similarly, for-profit schools receiving Title IV funds must annually certify that they have complied with their duty to report to the Department "any fraud, misrepresentation, . . .or other illegal misconduct by [anyone] involved in the administration of the Title IV programs." (*Id.* at 138.)

E.    **Claims for Payment under Title IV Programs.**

66.    After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways. Under the Pell Grant program and FDLP, for example, students submit requests for funding directly to the Department of Education or to the Department of Education with the assistance of schools. Under FFELP, students and schools jointly submitted requests to private lenders for loans that were guaranteed by state agencies that were, in turn, insured by the Department of Education, which paid in the event of a default.

67.    With respect to all Title IV programs, the disbursement of Title IV funding depends on a school's statements and certifications of compliance with various requirements, which are necessary for requests for payment to be considered.

68.    For all Title IV programs, students who are interested in receiving federal student aid must complete a "Free Application for Federal Student Aid," known as a "FAFSA."

## Title IV Grant Programs

69.    Under the Pell Grant program, which provides federal funds to assist postsecondary school students with demonstrated financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1, the student initiates the process by submitting a FAFSA to the Department of Education to have her expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell Grant program funds. 34 C.F.R. § 690.12(a). The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit it to the Department of Education on the student's behalf. 34 C.F.R. § 690.12(b).

70.    The Department of Education sends the student's application information and EFC to schools designated by the student, who then use the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student borrower. The financial aid package may include Pell Grants, FDLP

loans, or Campus-Based Aid (which in turn includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

71.    If the student accepts a Pell Grant, an FDLP loan (for which the Department of Education is both lender and guarantor), or both a Pell Grant and a FDLP loan, the school creates an electronic "origination" record that the school submits to a Department of Education computerized database called the Common Origination and Disbursement ("COD") system. The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD database, in turn, links the information in the origination record to another Department of Education database, which verifies the student information against what the Department already has.

72.    Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

73.    Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request...the funds are being expended within three business days of receipt for the purpose and condition[s]

24

of the [Program Participation] agreement." (*See* Example of G5 Certification, attached hereto as Exhibit 1.) Unless schools submit the express certifications of compliance with the PPAs, they cannot receive any funds from Title IV programs. If the Department of Education was aware that any school's G5 certification was false, the Department of Education would not make payments to the school.

### FDLP Loan Programs

74. The FDLP, through which the Department of Education makes loans directly to eligible students and parents, "enables an eligible student or parent to obtain a loan to pay for the student's cost of attendance at [an eligible] school." 34 C.F.R. § 685.101(a)(1).

75. Like the Pell Grant program, students seeking to obtain a FDLP loan begin by completing and submitting a FAFSA. 34 C.F.R. § 685.201(a); 34 C.F.R. § 682.102(a).

76. In order to participate in the FDLP, as opposed to a grant program, a student also completes a Master Promissory Note ("MPN") and submits the MPN to the educational institution. 34 C.F.R. § 685.201; 34 C.F.R. § 682.102.

77. Parents may also borrow money through the FDLP, in the form of a Parent PLUS loan, to help pay tuition and other related costs of education for their children. 34 C.F.R. § 685.200(c); 34 C.F.R. § 682.102(c). A parent borrower

commences the loan process by completing and submitting a Direct PLUS MPN for a Parent Direct PLUS loan. 34 C.F.R. § 685.201(b).

78.    For student loans, schools participating in the FDLP must at a minimum create a loan origination record and ensure that the loan is supported by a completed MPN. 34 C.F.R. § 685.201(a)(2)(i), (ii). For parent direct loans, a participating school must complete and submit its portion of the PLUS MPN. 34 C.F.R. § 685.201(b)(3).

79.    A school participating in the FDLP must determine and certify that the student is eligible to receive the loan and must provide information regarding student eligibility to the Department of Education. 34 C.F.R. § 685.301(a)(1), (2); 34 C.F.R. § 682.102(a); 34 C.F.R. § 682.603(a). Among other requirements, to be eligible to receive proceeds from a FDLP loan, a student must be enrolled, or accepted for enrollment, at a school eligible to receive Title IV funding. 34 C.F.R. § 685.301(a)(2)(i); 34 C.F.R. § 685.200(a)(1)(ii); 34 C.F.R. § 668.32(a)(1)(i); 34 C.F.R. § 682.201(a); 34 C.F.R. § 682.603(a).

80.    As described above, for a school to be eligible to participate in Title IV programs, thereby making students attending the school eligible for FDLP loans, a school must comply with the Incentive Compensation and Misrepresentation Bans. By certifying that any student is eligible to receive a FDLP loan, the school is certifying its own eligibility to participate in the

programs, including its compliance with the Incentive Compensation and Misrepresentation Bans.

81.    As described above, a school participating in the FDLP also determines the amount of each type of FDLP loan (subsidized or unsubsidized), as well as other types of financial aid that the student is eligible to receive based on information provided by the student in the FAFSA and from other available sources. 34 C.F.R. § § 685.301(4), (5). The school submits this information to the COD system.

82.    Schools must verify that a student remains eligible to receive FDLP loan proceeds at the time of disbursement. Direct Loans School Guide at 5-66; Department of Education, Federal Student Aid Handbook at 3-135 (2010-11).

83.    Schools receive the proceeds of FDLP loans for disbursement through the G5 system. As described above, schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . . the funds are being expended . . . for the purpose and condition[s] of the [Program Participation] agreement." (G5 Certification, Exhibit 1 hereto.) Unless schools submit the express certifications of compliance with the PPAs, they cannot receive any funds from Title IV programs. If the Department of Education was aware that any school's G5 certification was false, the Department of Education would not make payments to the school.

84.    For subsidized Stafford loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

## VI.    **FALSITY: DEFENDANT SCHOOLS SUBMITTED FALSE CLAIMS AND STATEMENTS TO THE U.S. DEPARTMENT OF EDUCATION.**

85.    Defendant Schools knowingly made false statements, certifications, and claims regarding compliance with the Incentive Compensation and Misrepresentation Bans in order to become and remain eligible to receive Title IV funding. Defendant Schools' statements were false when made, and they caused the Department of Education to pay various claims under Title IV programs that Defendant Schools were not eligible to receive.

86.    Specifically, Defendant Schools falsely certified to the Department of Education that (1) they were not providing, and would not provide, any commission, bonus, or other incentive payment to any person or entity based directly or indirectly on success in securing enrollments, and (2) they were not and would not—and would not allow any third-party contractors to—make any false, erroneous, or misleading statement to any student or prospective student.

87.    Despite knowingly and openly violating both of these certifications, Defendant Schools continued to represent to the Department of Education that they were in compliance and therefore eligible to receive Title IV payments.

A.     **Defendant Schools Violated the Incentive Compensation Ban.**

88.    When Relator was first interviewed and hired on, he thought Defendant Schools' goals were to serve students the best they could and, during the admissions process, to prepare them for what to expect while attending classes. Relator knew how important and impactful that kind of a person can be for a non-traditional college student because he still remembers how that kind of a person changed his life when he was attempting to get a college degree.

89.    By the time Relator left, he had come to realize the job title of admissions advisor at CTU was actually a high-pressure sales position in disguise.

90.    Relator was eventually constructively discharged because he refused to participate in the violations required of him to keep his job. Relator essentially left because he could no longer participate in defrauding students, which is exactly what CTU required of him.

91.    When Relator began recruiting students for CTU as a National Admissions Advisor, CTU told him that his Expected Student Population, or ESP, was approximately 7 enrollments for the first recruiting session. There were 8 sessions per year.

92.    Every day was the same thing: enrolling students by any means necessary. This idea was pushed in every area of work. Relator never thought he would be someone who would actively engage in actions that he knew would

ruin someone's future and rob them of opportunities, but he was trained and conditioned by management at CTU to be a master manipulator whose only objective was to make more students start (and stay in) classes. Pressure from management came from the top down, and with each layer of management came an additional level of pressure. This intense pressure eventually landed on the recruiter, who then in turn put it onto the student. A toxic culture of fear was fostered. Recruiters were pitted against one another and pushed to break the rules and cross the lines into unacceptable behavior.

93.    CTU had three tiers of recruiters. National Admissions Advisors were the lowest tier and had the lowest Expected Student Population per enrollment period. The middle tier position was called a Senior National Admissions Advisor, which were required to enroll more students than National Admissions Advisors. In the highest tier were the National Admission Consultants, who had the highest number of expected enrollments per period.

94.    Relator was motivated to succeed at his job and to move up the ranks. Early on, he went to his supervisor, Kim Hill, and asked her how he could earn a promotion. She explained to him that if he wanted to earn a promotion to one of the higher recruiting tiers and make more money, he had to enroll more students. While later his supervisor tried to suggest that the promotion was solely based on the time he had been there, once Relator accepted the

promotion, he learned that the only difference between the tiers was the requirement to enroll more students—nothing else was different.

95.    Indeed, CTU placed its recruiters in these tiers based on their success enrolling students at the various levels for each tier that CTU required. The more students a recruiter enrolled, the higher in the tier system they rose and the more money CTU paid them. Conversely, recruiters who did not enroll greater numbers of students would not rise in the tiers, no matter how else they performed their jobs, and CTU did not pay them more money.

96.    While CTU paid lip service to other factors that supposedly determined which tier a recruiter was placed in, demonstrating that CTU was aware of the applicable legal requirements, the only actual factor was a recruiter's success in enrolling large numbers of students and their willingness and ability to continue to do so. The only difference among the tiers was the number of students the recruiters enrolled.

97.    There was a significant pay difference between the three tiers: National Admissions Advisors made approximately $21.63, Senior National Admissions Advisors made approximately $22.92, and National Admissions Consultants made approximately $24.30. The only way for a recruiter to move up the tiers and make more money was to enroll greater numbers of students.

98.    CTU's practices violated the ICB and applicable regulations.

**B.      Defendant Schools Violated the Misrepresentation Ban.**

99.    Misrepresentations are part of CTU business model—they are part of nearly every aspect of how CTU interacts with students and prospective students.

100.    For example, in their interactions with students and prospective students, Defendant Schools teach recruiters to act like someone else and to just "play the role." Defendant Schools' management would instruct recruiters that the prospective students "do not know who you are, so be someone else if needed just get them to enroll. Act as if you are in a position of authority while speaking so a student will do what you say." CTU would encourage recruiters to give an "Oscar-worthy performance" to convince students to enroll.

101.    During one team meeting, Defendant's Vice President (Rachel Goldberg) told the recruiters to "remove [them]selves from [their] own values and ethics while at work" so that they "do not feel bad or like [they] are pressuring people." Defendant's Vice President excoriated recruiters to "remove [their] thoughts and feelings about something and completely focus on getting the job done." She told them to "act like someone else while at work," and then added that "persuading a student to enroll even if they do not want to is the Oscar winning performance" that recruiters should strive for.

102.    CTU also stressed "one call conclusions"—or "OCCs"—during initial and subsequent training. CTU demanded that every student be a one call

conclusion, which meant that the students had completed the necessary paperwork to begin school immediately in a single phone call with a CTU recruiter. The University Vice President of Admissions, Keith Armstrong, pushed the "one call conclusion" mantra on recruiters nearly every day in his daily emails to them. The Vice President and the Campus Director would send their own emails pushing this same message.

103.   CTU's training of recruiters also included how to gather and use information from prospective students to manipulate the prospects into enrolling and starting at CTU in a single call. CTU gathered all the prospective students' information into Student Information Records—known as SIR sheets—including information gleaned about their goals, what they are afraid of concerning going to college, and what they hoped to accomplish by attending school. Recruiters would update the SIR sheet with new information about the prospective student that may be useful in the future to either convince the prospect to enroll or to stay enrolled.

104.   CTU trained its recruiters how to use the personal information known about the student in the SIR sheets—for example, that the student wants to go to college as a role model for their child—to later manipulate the student emotionally and psychologically. Recruiters would use this personal information to try to connect with prospective students and build rapport with them, or to shame them, which would allow them to more easily convince students to enroll.

105.    That information is also prominently available in the students' records on CTU's Student Prep Site, which was available to all recruiters and management. If a CTU recruiter needs to convince the student to enroll or stay enrolled, those emotional "buttons" are readily available to them.

106.    If a prospective student objects to enrolling (or staying enrolled), recruiters would use the information in the SIR sheet (and other records) to emotionally pressure them into doing so—recruiters were taught how to use shaming and embarrassment to convince students to enroll or stay enrolled. For example, recruiters would say things like: "You told me at the outset that you're at the point in your life where you need to change; you can't find a job, you're unhappy, you can't afford your bills. But now you don't want to start school, even though this is exactly what we talked about in the beginning."

107.    CTU's management pushes recruiters to enroll everyone and allow future processes to "sort out" whether the students were, for example, properly enrolled, could qualify for Title IV funding, had the required high school transcripts or GED, had the basic computer skills necessary to participate in an online education, or could even read or write. Ensuring students had the proper documents in place before starting was referred to as "document hunting"— management told advisors specifically *not* to do this. There were almost no set of circumstances or challenges facing a prospective student that CTU permitted its recruiters to deviate from the goal of enrolling the student to start

immediately in one call. Within one call, which can be as short as 15-20 minutes, recruiters direct students to quickly scroll through the disclosures and enrollment agreement. This is to trigger the application to move to the next step, get the student to sign the documents without taking time to look them over, and process the application as fast as possible. CTU's thought was that the longer the student considered enrolling, the less likely they were to attend.

108.    CTU ostensibly has "Rules of the Road" for recruiters that provide certain guidance to recruiters to ensure prospective students are not pressured or misled. In reality, the Rules of the Road are merely something CTU's management can point to if questioned. When a recruiter is enrolling a lot of people, it does not matter to CTU if the Rules of the Road are followed.

109.    For example, one rule in the Rules of the Road is that recruiters cannot provide a false sense of urgency to prospective students. But CTU's management has manipulated the requirement so pressuring students to "start now" can continue. The message provided by CTU's management to recruiters is that if it is important to CTU's interest for a student to act urgently, then it technically is not a false sense of urgency. The Campus Director, Director of Student Management, and the Vice President would stress the urgency of enrolling and getting people active in class. For example, in September 2020, Relator's supervisor, Kim Hill, sent a message to her entire recruiting team complaining that they were "not showing the urgency" she thought they should

be showing. CTU's Vice President of Admissions told recruiters on June 29, 2020, that they needed to "get some sense of urgency" in their recruiting practices. As another example, in August 2020, Ms. Hill told her recruiting team not to honor any prospective student's decision to start classes during the next cohort, since classes for the current one had already started the week prior, and she directed the recruiters to force every prospective student to start late during the current session so that they could be immediately counted as an enrollment.

110.    Even when CTU formally trained its recruiters to avoid discussing certain topics with prospective students—such as financial aid—in reality, CTU required its recruiters to do exactly that. For example, recruiters were often encouraged to walk prospective students through the Free Application for Financial Student Aid (FAFSA) form.

### CTU Trains its Recruiters to Mislead Prospective Students about the Nature of the Financial Charges, Including about the Cost of Tuition

111.    Recruiters are taught to hide the true tuition costs from prospective students. Recruiters are trained to provide the tuition costs as if the student would take an accelerated track, which almost no student (if any) is able to complete. While the cost of the rarely (if ever) used accelerated track was $16,000 (at the time Relator was there) for the most common associate degree, the tuition cost for the vast majority of students was actually closer to $31,000. For the most common bachelor's degree, the accelerated track was pitched as $37,000 even though the true tuition cost for most students was actually closer

36

to $61,000. But recruiters were trained to convince students that they would be saving 30% on the cost of their degree, as well as their time earning that degree through accelerated tracks, called Fast Tracks.

112. Recruiters would use Fast Tracks as a selling point when trying to enroll students. When a student requested to cancel their program due to the cost or the inability of financial aid to cover the full costs, the Fast Tracks were framed as the solution to all their concerns.

113. Fast Track credits are supposed to be earnable by students who already have proficiency in certain subjects and they use the Fast Tracks to essentially test out of certain classes. At least, that is how CTU trains its recruiters to use them to convince students their tuition costs might be lower than they actually will be.

114. In reality, however, almost no student was able to actually complete a Fast Track because it required students to actually be proficient in the subject, and CTU had every incentive to make them as difficult as possible to earn. If the students did not earn the Fast Track credits, they would be forced to take the classes from CTU instead.

115. For example, in March and April 2020, CTU enrolled a student, R.L., based on promises relating to Fast Tracks, even though CTU knew at the time that her remaining available Title IV aid was very limited and that she would have to pay out of pocket. CTU knew R.L.'s remaining Title IV funding was less

than $2,000. When R.L. realized that she would have to either take private loans or pay out of pocket, CTU recruiters did what they were trained to do in these situations—they convinced the student to "decelerate" her classes, which only serves the purpose of delaying the inevitable problem of the student's lack of sufficient Title IV aid to complete the program. Instead of addressing the problem—the student's lack of available funding—the recruiters are trained to use paperwork tricks to keep the student enrolled just long enough to incur debt to CTU. That is precisely what happened to R.L.—despite CTU knowing that she faced an imminent problem with Title IV funding, they pushed her into starting classes with the lure of Fast Tracks. When she inevitably failed to pass the first Fast Track she attempted, she wanted to avoid going to school at CTU. But since the classes had already started the week prior, when she posted once in the online classroom discussion board, she was considered fully enrolled by CTU at that time. CTU claimed that she owed the school more than $830 for less than two weeks of classes.

116.    Another tactic that CTU trained its recruiters to use is the false prospect that the potential recruit might qualify for benefits available to those in the military or with military service. CTU's recruiters and outside lead generators would often mislead students about their eligibility for the lower rates for those with military service. Recruiters would transfer students whose "uncle once served in the military" or whose "father served in Vietnam" to the military leads

team, falsely suggesting they could qualify for the special, lower tuition for active military members. By the time the prospective student was told he or she did not actually qualify for those rates, CTU's recruiters have already moved the student through key parts of the enrollment process and can then use Fast Tracks or some other trick to keep the student enrolling.

117.    Defendant Schools also used military experience to try to recruit students through so-called "Experiential Learning Portfolios" (ELP). Like the Fast Tracks, Defendant Schools trained their recruiters to use the possibility that a prospective student could lower his or her tuition costs by earning college credit for prior life experience in order to recruit students to the school. However, like the Fast Tracks, in reality, CTU rarely granted these credits to any student, even though almost every student was told they might be eligible. For example, L.G., who was recruited in November 2018 with the promise of ELP credit, was unable to earn any experiential learning credit even though he submitted the necessary paperwork and had actual work experience that made most of the entry-level classes way too easy for him.

118.    Most students who attempted to get ELP credit were ultimately denied because it was nearly impossible for them to get a detailed description of the course requirements that they would have to show they satisfy in their submitted experiential learning portfolio. Because this simple information was a closely guarded secret at CTU, students were "shooting in the dark" when trying

to obtain ELP credit, which meant most of them failed. The system caused otherwise deserving students to miss out on ELP credits, and CTU knew it. This despite that CTU trained recruiters to aggressively dangle them to prospective students as a likely way they could save tuition costs.

119.    All these supposed ways for students to pay less tuition—Fast Tracks and Experiential Learning Portfolios—were essentially bait and switch tactics by CTU. Almost every student was told about them in a way that suggested they could be eligible for them, but, in reality, very few students ever received these credits. And as noted elsewhere, students would first have to enroll, sign a Student Payment Agreement (SPA), indebting themselves to CTU, and start classes before CTU would inform them whether they would receive any credits through these accelerated track programs. For a student to even have a serious conversation with someone at CTU about how to earn these alternative credits, the student had to be enrolled—a student could not find out before signing up whether he or she would be eligible for them before committing to CTU. By the time the students later learned they would not receive any such credits, which was true for the vast majority of them, they were already committed to CTU and could not back out without severe financial consequences.

## CTU Knowingly Allows Its Recruiters to Mislead Prospective Students about the Employability of Graduates.

120.    Another topic that CTU recruiters often misrepresent to students is the availability of career services. CTU's recruiters promise prospective students that they will have access to career services, but there is no career services department any longer. It is gone. The department was closed and it is left to student advisors, who are not trained in career services and who are not provided with the necessary resources. Relator asked CTU's management about career services and they said, "We don't have career services anymore." But that is not what CTU's recruiters tells the students. Instead, it is used as leverage to get them and keep them enrolled.

121.    For example, M.A. was a student who wanted to cancel her program and attend her local community college. She was worried about earning a degree she would not be able to use. When her admissions advisor was not able to "recommit" M.A. to CTU by reminding her of her goals, the advisor transferred her to Student Success Coach. The coach then had M.A. log onto the Career Services section of the Virtual Campus and told her she would need to "look within herself to come up with the answers." This was followed up with a note on the students file that said "[s]tudent knows how to use Career Services and course catalog." Four days later M.A. requested to cancel her enrollment via email for the second time, and then followed that with another request via email

two days later, writing, "I DO NOT INTEND TO ATTEND YOUR SCHOOL." It would be another four days before she was unenrolled.

122. CTU also trains and permits its recruiters to mislead prospective students by promising them specific jobs from specific degrees, but these promises are not realistic. For example, CTU's recruiters tell prospective students things like, "you can be an accountant" when they enroll them in an Associates Degree in Accounting. But that's not true since far more training and certifications are necessary.

123. Likewise, CTU used bait-and-switch tactics with its "online criminal justice" course. For example, in October 2019, a prospective student attempted to enroll in the "online degree program" for "Criminal Justice – Forensic Investigation," which CTU's website advertised as an online-available program, despite that CTU only offers that program in-person at its two brick-and-mortar campuses in Colorado. When this happened and an enrolled or prospective student discovered that their chosen degree was not actually available online, CTU specifically trained its recruiters to try to convince the students to instead switch their enrollment to an online program for human services or to the criminal justice general education program, which CTU's recruiter Darnell Johnson attempted to do to this particular student. There were many students who became entrapped in CTU's system in this way—thinking they could pursue a certain degree and only later finding out it was not available.

124. Similarly, L.R. was originally enrolled with the impression she would not have to do anything further for a Project Management Professional (PMP) certification. Relator spent time helping her find the actual information online, correcting what the previous recruiter led her to believe to get her to enroll.

## CTU Uses Lead Generators to Mislead Prospective Students about the Nature of Its Educational Programs, Suggesting They Are Actually Jobs Instead.

125. As noted above, one of the primary sources of new leads for CTU's recruiters were third-party lead generators, who used various internet-based schemes to obtain contact information for "prospective students," though often these people had no inclination to go to school whatsoever. These lead generators were numerous and seemed to be ever-expanding—entities such as Quinstreet, Education Dynamics, Becker Interactive, Course Advisor (*fka* Bull's Eye), Media Spike, Banner Edge, BirdDog Media, Triad Media, Vinyl Interactive, Unigo, World Class Strategy, and One on One.

126. The quality of leads from these lead generators was often poor. They would transfer the recruiters leads who were, among other things, homeless, currently in a nursing home, without a computer and misled they could get one from CTU, looking up jobs on the internet and being led to believe the call from the lead generator was part of a job interview, confused about military benefits, and people who were "filling out the FAFSA and the FAFSA webpage recommended CTU as a top school."

43

127. A common form of misrepresentation that CTU and these lead generators used to entice prospective students to enroll was to allow the lead generator make false promises to the prospective student and then transfer the lead to a CTU recruiter while under this false impression. CTU recruiters were well aware that the leads harbored these false impressions, but CTU management expressly forbade recruiters from correcting those misimpressions. Instead, recruiters were told to "work with" the misunderstanding—don't confirm it, but also don't correct it. Relator enrolled many students who held a fundamental misunderstanding of what they would receive and could expect because of the false statements of lead generators who transferred these student leads to him.

128. L.C. is an example of a prospective student who only became entangled in CTU's web of deceit because he was online looking for social security benefits. L.C. was in his 70s and in a nursing home when he was put in touch with Relator, who was asked by CTU to enroll L.C. in online college. In around 2020, L.C. told Relator that he had been online looking for "social security grants" when he was somehow connected with CTU's outside lead generator. L.C. did not have a computer or internet and apparently was bed ridden. L.C. would talk about random topics and seemed to believe that the call was only about how he could obtain monetary benefits from the government, not attend college. Relator was instructed by CTU in these situations not to

clearly explain that the benefits are tied to a bona fide effort to obtain a degree, but instead to gently steer the conversation back to the idea of attending online college. Recruiters such as Relator were trained not to directly correct any misinformation the prospective student may have received from CTU's lead generator, but instead to work to direct the prospective student through the enrollment process.

129. Likewise, T.M., whom CTU recruited in November 2020, is representative of a number of people that CTU aggressively tried to enroll through its lead generators. T.M. was homeless and had been searching the internet for various types of government assistance programs. He somehow became connected to an outside CTU lead generator through this internet activity, who then transferred him to Relator to recruit. T.M. did not have a computer or reliable internet, and he did not even have regular access to his cell phone because he did not have a charger for it. He had been couch surfing and using chargers belonging to others when they were available. Nevertheless, despite all these problems, CTU expected Relator to genuinely try to recruit T.M. for enrollment.

130. Similarly, in November 2020, D.L. was transferred to Relator from one of CTU's outside lead generators. D.L. lived on a Native American reservation and said that he was told by CTU's lead generator, directly before being transferred to Relator, that he qualified for some special grant for Native

American students from the reservation, even though that was untrue. Around this time—and at various intervals—Relator would receive many similar transfers from CTU's lead generators from people on Native American reservations who told Relator they were told similar things by CTU's lead generators.

131. Another example was E.B., who was an immigrant who enrolled under the impression from lead generators that he was eligible for federal financial aid. He could barely speak English and was under the assumption that he would qualify for funding because he had a green card. He was not able to register for selective service. E.B. did not have a computer or internet access. He told Relator how nervous he was about starting due to his limited English, and he said he was not sure if he should continue. CTU's management was aware of this, and Relator had to push him into class anyway. He ended up withdrawing after incurring debt to CTU.

132. CTU's lead generators clearly targeted specific groups of prospective students based on their internet activity. CTU's recruiters would receive numerous leads from women claiming they qualified for non-existent "scholarships for single moms," for example. For instance, R.B., whom CTU recruited in September 2020, was supposedly "working with someone on a grant for single moms" but ended up signing a payment agreement with CTU instead. This was another common tactic that CTU's outside lead generators would use to entice prospective students to speak with one of CTU's recruiters, like

Relator. As with the other misrepresentations peddled by CTU's outside lead generators, recruiters were instructed not to correct any misimpressions that a prospective student might repeat to them, but rather instead focus on enrolling the prospective student, even if the prospective student continued to harbor those false assumptions.

133.  Another of CTU's lead generation schemes involved telling prospective students they could receive a free grant of $6000.00 ($6345.00 to be exact). The lead generators would then transfer the prospect to a CTU recruiter under the impression that they can receive a "free $6,000" for signing up for college. For desperate students, the enticement of $6,000 can be powerful. Relator talked to many students who asked about the $6,345.

134.  One of the most pernicious techniques used by CTU and its lead generators involved convincing "prospective students," who had actually been searching the internet for job leads, that they were actually "prospective employees" in a telephone job interview with a well-known company, such as Coca Cola or Amazon. Relator and the other recruiters were transferred numerous "prospective students" who'd explain they were in the middle of a job interview and the "prospective employer" recommended that they start classes with CTU to advance their career. The "prospective student" would explain he or she had been transferred to the recruiters to complete their job

interview/application. The leads would continue to ask about the "job portion of their interview," confused as to what just happened.

135.   In September 2020, for example, C.C. was transferred to Relator to recruit even though he only wanted to apply for a job and was transferred to Relator under the false impression that he was going to help C.C. apply for a specific, open job position. C.C. got a "call [from a] recruiter for jobs" and, after someone C.C. thought was a job recruiter asked him whether he might have an interest in education, he was suddenly transferred to Relator. C.C. had not been searching for information about college or schooling, he'd only been looking for a job. But that was enough to make him a target of a CTU lead generator, which led to his transfer to Relator, who, despite C.C. having no actual interest in online college, was still supposed to try convince C.C. to enroll.

136.   R.D., whom CTU tried to recruit in November 2020, is another example of a prospective student that Relator was required to try to enroll in CTU's online college despite that R.D. had no interest in attending school. When she was transferred to Relator, she was completely confused about why she had been transferred to a recruiter for an online college when, only moments before, she had been talking to someone she thought was helping her apply for a job. Although she thought she was speaking to an employment recruiter, R.D. had actually been talking to one of CTU's lead generators posing as an employment recruiter. R.D. explained to Relator that she had been on the internet searching

for jobs and had provided her contact information to start the application process. Later she received a call from someone offering to help her find a job, but after speaking to that person (who was actually a CTU lead generator for Education Dynamics Lenexa), she was transferred to Relator. R.D. thought she was being transferred to complete the job application process, but Relator's only role was to try to enroll her in a program at CTU. Although R.D. did not enroll in CTU, there were many others like her that were convinced to enroll, even though their only connection to the school was from lead generators preying upon their efforts to find and apply for jobs, often through similar bait-and-switch tactics. Recruiters, like Relator, were trained how to try to convince these leads to enroll in CTU by pivoting from their actual desire for a job to the hope that enrolling in CTU might improve their job-search prospects.

137. Defendant Schools are responsible for any violations of the Misrepresentation Ban committed by the lead generators. "[I]t is longstanding Department policy that an institution is responsible for the actions of any entity that performs functions and tasks on the institution's behalf." 75 Fed. Reg. 66832, 66875 (Oct. 29, 2010); *see also* 34 C.F.R. § 668.14(25) (An institution is "liable for all . . . [r]eturns of Title IV program funds that the institution or its servicer may be required to make"); 34 C.F.R. § 668.25(c). As such, Defendant Schools are responsible for the lead generators' misrepresentations and violations of the Misrepresentation Ban.

138.   Additionally, because Defendant Schools are obligated to ensure that lead generators comply with the Misrepresentation Ban by virtue of 34 C.F.R. § 668.25(c) ("In a contract with an institution, a third-party servicer shall agree to . . . [c]omply with all statutory provisions of or applicable to Title IV of the HEA [and] all regulatory provisions prescribed under that statutory authority."), the known misrepresentations by Defendant Schools' lead generators are attributable—and imputed as a matter of law–to Defendant Schools. Defendant Schools are liable for the misrepresentations of their lead generators as if Defendant Schools had made the misrepresentations themselves.

### CTU Targets Veterans for Particular Abuse.

139.   Despite CTU's explicit focus on recruiting students with military benefits, including veterans, Relator received virtually no training about how their benefits differed from other students.

140.   In October 2020, CTU moved Relator, who was a very successful recruiter, to recruiting only military students/veterans shortly before Relator was constructively discharged. His team was told it was specifically to meet the administrative 90/10 rule, which limits how much Title IV funding a school may receive (but exempts veterans' benefits from that calculation).

141.   The training to work with these military/veteran prospective students consisted of one session that lasted a total of an hour. The next day

after this training, the Senior Campus Director of Admissions, Josh Pease, said, "the only difference between military students and regular students is the language used." Relator's team was told that military students were the same as any other student in the sense that "it is just another sale." Mr. Pease then smiled and said, "whoops, I will slap my own hand, I forgot we can't use that word: 'sales,' but really it is."

142.    And just like with other types of prospective students, CTU engaged in systematic deception and misrepresentations with veterans and active servicemembers to convince them to enroll and start immediately. Oftentimes, Relator would see these students end up in withdraw status and charged for classes.

143.    Prospective students were often transferred to recruiters, including Relator, from lead generators after prospective students searched the internet for terms like "military friendly schools," "military benefits," "military tuition assistance," "GI Bill," and "college grants for veterans." After the students entered their contact information at the website they found from the search, run by a lead generator with whom CTU has contracted, within minutes the prospective student veteran received a call from the lead generator running the website, who then immediately connected them to CTU.

144.    It was always obvious when CTU's lead generators had discovered a new scheme because suddenly prospective students would be transferred over

consistently saying the exact same thing. One example that sticks out in Relator's memory was when CTU's lead generators began telling military-affiliated students they "could go to school online and still have money left over for housing," a promise that was almost never, if ever, true. Relator often heard students say they were told they could go to school online with their military benefits and that they would have enough funding to cover their housing costs. As with all the false things the lead generators told prospective students, CTU instructed its recruiters not to correct the statements promising veterans things that weren't true.

145.   There are many students Relator enrolled in this position that would end up trapped paying for classes and never getting benefits they were originally looking for when they started their search. They would end up exhausting both their veterans' education benefits and their regular federal grants and loans by the end.

146.   For example, L.J., who was recruited in December 2016, was initially told that his veterans benefits would cover his tuition and  "received no communication from CTU" that they were not going to be, which turned out to be the case. He was told by CTU that he would be put in the "yellow ribbon program" for the VA's yellow ribbon grant (see https://www.coloradotech.edu/military/yellow-ribbon-grant), but that never

happened. He ended up saddled with debt because CTU never communicated with him regarding his benefits and the charges.

147.    Very often, military students believed that they were having their tuition covered by benefits and other grants, only to find out later that CTU had not processed their military benefits correctly and instead drained their Title IV student aid eligibility or charged them for the classes. The students believed the school was handling this for them—because the recruiters would heavily tout the benefits—but, in reality, nothing was done by CTU to pursue these potential benefits.

148.    Trying to convince prospective students that might have vocational rehabilitation benefits from the Veterans Administration to start before their benefits were confirmed was another common tactic CTU trained its recruiters to use. In fact, CTU had a term for it—"military move-ups." Basically, the goal was for CTU's recruiters to use the lure of various possible benefits tied to military service that a prospective student might be eligible for, and before the prospective student learns whether or not they actually qualify for the benefits, get them locked into the school by having them start classes before learning about the benefit determination. If the benefit determination is adverse, the student is already liable to CTU and will use other benefits, often Title IV benefits, to pay for the classes.

149. For example, M.D., whom CTU recruited in November 2020, had made it clear to everyone at CTU that she did not want to start classes until the school had the appropriate paperwork to ensure that the vocational rehabilitation program was going to pay her tuition. Nevertheless, M.D. was pressured her relentlessly to start classes before the paperwork for that approval was in place.

150. As noted, Relator and the other recruiters were trained to push the veterans into moving up their start date, even if their military benefits had not been verified or determined. Just like the other policies broken by CTU, on paper, CTU's policy were designed to make sure military students have the time needed to make the best decision for themselves. But in practice, to get as many veterans as possible started as quickly as possible, management required recruiters to pressure the student to begin immediately.

151. This would often result in students having to pay for charges out of pocket and by using Title IV grants and loans instead of waiting a few weeks and having the cost covered by their military benefits. This would happen for students using military tuition assistance benefits or vocational rehabilitation benefits. Relator and the other recruiters were trained to tell them "not to worry about it; that it would work out." But the recruiters never actually followed up with students to make sure they completed the paperwork, so often students would not have the right documentation on file to receive the military benefits

they were entitled to. Many students Relator worked with ended up in this position.

152. For example, H.S., whom CTU recruited in February 2020, was never able to get clear information from CTU's financial aid department about his benefits. The different financial aid advisors at CTU that he talked to were giving him conflicting information about whether he would qualify for Title IV benefits. He was also in the military reserves and about to be deployed. Despite that there was never clarity about whether he would qualify for Title IV financial aid, and despite that H.S. stated that he wanted to use his military benefits and not Title IV financial aid, Relator followed his training and pushed H.S. to enroll immediately. This lack of clear determination and communication from CTU's financial aid department about whether prospective students' benefits would—or could—be used to cover tuition was pervasive and rampant. CTU's recruiters were regularly asked to push prospective students into starting classes without a clear understanding of what financial aid and other benefits the students qualified for, and, therefore, what their actual out-of-pocket costs would be. This is obviously an important consideration for prospective students, but often CTU would push them into starting without knowing such basic information, as was its practice.

153. Relator was pushed by CTU's management to enroll military students even though Relator knew it was not in their best interest.

**CTU Is Not Honest about the Nature of Its Educational Programs Because Students Who Either Clearly Did Not Understand What They Were Being Asked to Sign or Who Clearly Lacked the Ability to Benefit Were Targeted for Enrollment.**

154. One set of prospective students that CTU required recruiters to enroll and start immediately were those who very clearly lacked basic reading-and-writing skills or perhaps faced cognitive or mental challenges. Relator personally worked with a range of prospective students—those just out of high school, all the way to those going back to college for the first time after decades away from school. Relator also personally worked with prospective students all the time who had never used a laptop before and lacked even the most basic skills to use one, even though CTU's entire education is provided online through computers. Relator, along with every other recruiter, could tell the difference between a student that just needed a little help getting acquainted with the online classroom environment and a student that clearly lacked basic skills or abilities to succeed.

155. There were also prospective students who could not read or write. Recruiters would have to spell out each word for the student. Recruiters would resort to pointing to different symbols and use descriptors of various objects on the screen to get the student through to the next step of the enrollment process when they couldn't read. Even if the prospective student was unable to read or write, CTU pushed recruiters to enroll them anyway. Even if the student did not know how to put a sentence together or understand how to do anything they

were asked to do, if a recruiter could get them to click the right boxes and fill out the forms through virtually any means necessary, it still counted towards a start for the recruiter and brought in Title IV financial aid money for CTU. Enrolling a student in this situation during one call with the expectation that they have a clear understanding of the disclosures and enrollment agreement they signed is completely unrealistic—and everyone at CTU knows that.

156.   Relator has also seen many prospective students who, when they clicked to "sign" their student payment agreement, did not understand what they were signing. The student payment agreement is a contract the student enters with CTU regarding their payment of fees. Students would be confused, for example, because they were led to believe they would have some sort of stipend to pay for school. It was clear to Relator when speaking to certain prospective students that they lacked an understanding even of what a monthly payment was. Many students who could read or write and who lacked basic math skills were stuck with one of these payment agreements simply because they did what the recruiter told them to do. Students only need to check a box to agree to this payment agreement.

157.   For example, in 2020, CTU recruited D.C. into the computer science program. Relator was told by CTU's financial aid department that D.C. "signed" financial aid documents, but he learned that the student had actually clicked on all the boxes to "sign" the documents before the advisor had a chance to even

explain what the documents were for and what the student was agreeing to. Instead of stopping the process and taking the time to make sure D.C. understood what he was signing, the advisor told Relator he just "went along with it" and did not bother to explain anything to the student. Because of the way CTU's systems were set up, it is likely many other students likewise clicked through the lengthy application process without ever understanding what they were agreeing to, including during the financial aid part of the process.

158. Other prospective students simply did not understand what was currently happening—they seemed to have either serious cognitive or mental issues that prevented them from fully comprehending what they were being asked to do. It was clear they did not understand what was really going on, the impacts of it, and lacked the ability to understand the charges they were agreeing to pay in the various agreements they were asked to sign. These prospective students would repeat the same things or ask the same questions over and over. Recruiters would have to continuously redirect the student and bring them back to what was being completed. Relator, along with other recruiters, understood from their interactions with the prospective student that he or she was not fully aware of what was happening and probably lacked the cognitive capacity to understand the forms they were being asked to sign. But recruiters enrolled and started these students anyway because they would be penalized by their supervisors for doing otherwise. CTU's Campus Directors,

along with everyone else in management, were unconcerned about what was happening to these students. On the contrary, they were very concerned about missing out on the Title IV financial aid funding that these students would be able to provide them.

159. T.G. is an example that stands out in Relator's memory for many reasons—her case involved both a basic lack of awareness of what was happening, what she was being asked to do, and the ramifications of what she was being asked to sign, combined with a basic lack of necessary technology. Relator worked with her in approximately November 2017.

160. T.G. generally did not have access to a functional computer—a common student problem addressed below. She got Relator's name wrong each time they spoke on the phone; she could not read or write. Relator had to spell each word out for her and had to help her with what to write on the forms. To Relator, it seemed he was telling T.G. what to write and doing the work for her. She did not understand the financial aid paperwork she completed. It was clear to both Relator and her financial aid advisor that T.G. did not know what was happening. She could not do any other assignment but the ones that someone else essentially did all the work for her.

161. CTU's most senior management was aware of T.G. and her situation. Relator's cubicle was right next to the offices of the Director of Student Management, Barbara Sanborn, and the Vice President of Admissions, Rachel

4828-1743-2623 v3

Goldberg. Relator's student manager sat in the cubicle directly in front of him and could hear anything being said. If their doors were open, as was often the case, Ms. Sanborn and Ms. Goldberg were close enough to hear what Relator was saying (and Relator was close enough to hear what they were saying). Relator often spoke loudly and sounded upbeat on calls because it would make him come off as more engaging to a student in front of his managers.

162.    After ending calls with T.G., Relator would often look over into Ms. Sanborn's office to make comments about the amount of time it took for her to complete simple tasks—letting her know that this prospective student had obvious mental health or cognitive problems that would prevent her from ever benefitting from CTU's services. Relator would literally spend hours on the phone with T.G. to get her to complete a task that should have taken 15-20 minutes. On each call, she could not remember Relator's name. T.G. would most often call Relator by "Ed." Relator's colleagues began calling Relator "Ed" as a joke and one night they added post-it notes to his nameplate that reflected the name. During team meetings, everyone referred to as Relator as "Ed" as a joke. Since the source of the "Ed" joke was well known, Relator's Campus Director and other managers were well aware of T.G. and her circumstances. The Director also saw Relator on the calls with T.G. for hours. When Relator finally was able to cajole T.G. into completing the necessary online paperwork to enroll, he went into his Director of Student Management's office (Barb Sanborn) to announce it.

He did the same thing with his team in a chat. Everyone knew that Relator had enrolled this prospective student who couldn't even manage to retain Relator's name for short periods of time—much less understand anything else she was being asked to sign and agree to.

163.    T.G. stands out from among the thousands of other students in a similar situation because after she ended up predictably failing out of CTU—after all, she had no access to a computer or the basic competencies to succeed—she called in and said she wanted to kill herself because of it. It sounded like she was already formulating a plan to do so, so Relator had to call the police and have them do a wellness check. All of this happened because she was pushed into something when it was clear she should not have been in that position. Relator knew that he was part of the reason she was in that position. CTU had instructed, trained, encouraged, and supported Relator in doing exactly that—all with full knowledge of T.G.'s obvious cognitive or mental health problems.

164.    T.G. also stands out because despite the situation, CTU did not view what it did to T.G. as something to be avoided. To the contrary, CTU management held her up in meetings when discussing how to push the more "challenging students" into classes.

165.    Unbelievably, CTU recruited her again and, again, she ended up failing out. She became a withdraw student after CTU used her for her Title IV financial aid.

166.    Relator was trained, encouraged, and instructed to enroll T.G. The only thing that CTU would have punished Relator for in that situation is if he had decided not to enroll T.G.

**CTU Is Not Honest about the Nature of Its Educational Programs Because It Knowingly and Aggressively Recruits Students without Access to the Internet or a Functioning Computer into an Online-Only Education, Predictably Ending in Failure.**

167.    Another obstacle to the ability of students to complete coursework that was frequently ignored by CTU was lack of computer and internet access. Most students and prospective students that Relator interacted with, across the university, did not have a computer or internet to complete their coursework. They were told to use their cell phone for classes. This was very frequently a barrier to students being successful in CTU's programs. Not only did CTU fail to adequately ensure that students had the required technology to complete the coursework, when it had actual knowledge of their lack of the required equipment, it did nothing to accommodate their situation.

168.    Perhaps most importantly, CTU would knowingly recruit and enroll prospective students who CTU knew lacked the required technology—for example, students who volunteered that they lacked the necessary computer or internet access. Despite that CTU was setting these students up for obvious

failure—the examples are too numerous to count—recruiters were expected to enroll these prospective students regardless.

169.    For example, D.J., was homeless at the time Relator tried to recruit him and did not have laptop. Because D.J. was not yet twenty-five years old, the FAFSA required him to either include information about his parents' income or, if that is not possible, attempt to get a waiver for that requirement, which is very difficult. In D.J.'s case, as is common, he had been estranged from his parents for several years and had no way to contact them for their income information. CTU trained its recruiters to attempt to enroll these students immediately by convincing them to sign a Student Payment Agreement (SPA), indebting themselves to CTU, instead of waiting to see whether the requirement could be waived and they could qualify for Title IV financial aid. In almost every case Relator can recall, the waiver was not granted and the student dropped out but still ended up with debt to CTU. That is what happened to D.J. And if a recruiter refused to follow CTU's instructions for these kinds of students—or, really, any instruction at all—because of reservations about CTU's practices, a supervisor would simply reassign that prospective student to a different recruiter who would follow those instructions without questioning them. This was one the many ways that CTU pitted recruiters against each other in a competition that often resulted in questionable practices and the ignoring of requirements that should have prevented some of these practices.

170.    T.G., discussed above, is another example of a student who, in addition to having several other challenges, also lacked the necessary computer and internet access to complete her courses, even if she had been able to overcome her other challenges.

171.    M.F. is also an example of CTU's recruiters pushing and hounding a student who did not have the necessary equipment to enroll. On April 7, 2020, a CTU recruiter noted that the student "doesn't want to start class until he knows what he's working with when it comes to FA [financial aid]." Even though the student was in a bachelors degree program for information technology, M.F. also disclosed that he only had an older iPhone (iPhone 5) to complete his work on because he could not afford a laptop computer. Nevertheless, CTU recruiters continued to pester M.F. to try to get him to enroll immediately.

172.    To be clear, these examples represent just a few of thousands of students in a similar situation, who lack access to the needed technology (computer and internet) to complete a degree offered entirely online through computers.

### CTU Is Not Honest about the Nature of Its Educational Programs Because It Would Often Trick Students into Enrolling and Made It Virtually Impossible to Cancel Once Students Were Enrolled.

173.    While there was almost nothing that would prevent CTU from enrolling a prospective student, once enrolled, CTU made it almost impossible for a student to disenroll.

174. The goal of Relator's department was to persuade (or trick) a student to "complete" one discussion board for orientation, which only had to consist of one word or even a single letter or number, and one discussion board for their first class (same minimal requirements). By typing a single letter or number—really anything—they were considered enrolled in class. If a student did not have the capacity to understand or did not want to do anything on the discussion board, Relator and the other recruiters would tell the student to "just post 'hi' and call it done." If they would not do the discussion board, or if they could not understand how to post a discussion board, Relator and the other recruiters would have them press a button on the Intellipath assignment to lock them into classes. Relator and other recruiters would often just tell the students what to write and have them copy their post from orientation for every new class.

175. CTU recruiters pushed students relentlessly to get them to post and become a start. CTU expected recruiters, such as Relator, to document in the students' files their efforts to convince students to post these first assignments so their supervisors would know they were doing so. C.H., whom CTU recruited in November 2020, highlights the extreme and shameless lengths that CTU's recruiters were pushed to convince students to complete these first assignments so they would count as a start for CTU. In this case, after enrolling, C.H. "had a tragedy in the family" and explained to CTU's recruiter that "now isn't a good

time [to start classes] because of the tragedy in her family." But CTU persisted, with a different recruiter calling the student several hours later, only to force the poor student to repeat that "she has been dealing with a family tragedy and will need to put off school." C.H., after the recruiter tried to convince her to start anyway, had to explain that she "hasn't been sleeping and really wants to postpone class." Even after all this, the CTU recruiter's intention was to call the student again to "attempt [a] recommit."

176. Relator recalls other CTU recruiters would frequently try to convince kidney dialysis patients to enroll and complete their assignments while undergoing dialysis treatment. The recruiters would try to convince dialysis patients that they could use the convenience of CTU's mobile application to complete assignments while undergoing medical treatment.

177. Another example of CTU's recruiters misleading a student into extending his enrollment is R.S., who CTU recruited in October 2020. R.S. is yet another example of a student who did not have a computer and was trying to complete a college degree using only his cell phone. Eventually, as would most in his situation, attempting to complete an online college course using only a smartphone did not work out, and R.S. decided that he wanted to withdraw for various reasons. However, CTU's recruiter attempted to convince the student to continue to update his attendance date in their system, using manipulative language about how the student shouldn't let anything change his mind about

continuing since there was nothing "physically stopping [the student] from moving forward with [his goals]." CTU recruiters were trained not to consider students' unique life circumstances, including whether there was an actual barrier to online college, and instead were trained to respond to students' actual, real limitations with self-help-type motivational speeches. The goal for the recruiters was to get a start no matter what, so if emotional manipulation was needed to accomplish that, they would use it.

178.    Once a student has enrolled and started by posting something twice on the discussion board, CTU makes it almost impossible to voluntarily withdraw or cancel without incurring charges. As discussed above, during the recruiting process, recruiters are trained to make note of specific personal information about each student for later use. When a student tried to withdraw or cancel, recruiters or managers would use their own words against them—they are trained to remind the students of why they said they first called CTU in an emotionally manipulative way.

179.    Once a student gets locked into these classes, Relator and the other recruiters were trained to tell him or her that there was nothing that could do for them to withdraw without charges and that they had to talk to their student success coach—a different type of CTU representative—who were also trained how to prevent a student from withdrawing.

180. When a student was already enrolled and was really committed to cancelling, which required a great deal of fortitude, he or she was then sent to a manager to prevent that from happening. When a student tried to cancel by email, the response was, "You have to cancel by phone only." Then, the student was put on a non-recorded line with management. These conversations were called a "second voice" or "recommitting the student." When these situations happen, the calls were transferred to management, who would use any means necessary to convince the student not to cancel. The sole intention of these calls was to convince a student to change his or her mind. Since these calls are not recorded, there was no check on how predatory and pushy the calls became.

181. Relator is aware of CTU students who requested to cancel—even in writing—and the school representatives instead continuously called them nonstop to do one more posting on the discussion board. There were students who would ask over and over and over to cancel. Students who tried to cancel would get six to seven calls a day for two to three weeks after they cancelled and even after they request the calls stop; a student would get called every hour from 8 a.m. to 8 p.m. every day; he would receive eight calls before 10 a.m. Management would have different advisors call over and over all day long, pressing students to "just post one word on the discussion board, just post 'Hi.'"

182. For example, S.B., who CTU recruited in April 2020, was locked into starting classes and owing money to CTU before she was able to find out

whether financial aid would cover her tuition. Only after she was on the hook to pay CTU through a student payment agreement (SPA) did she learn that financial aid would not fully cover her tuition and that she could not afford to attend the school as a result. S.B. decided she wanted to instead attend a local community college that was much less expensive. Worse yet, because no one at CTU explained the ramifications of doing so, the student continued to do coursework after telling CTU she wanted to withdraw, which caused her "last day attended" to be extended and increased the tuition CTU was able to earn. As the records show, the student was rushed into class on April 7, 2020, but was not informed that federal financial aid would not fully cover her tuition costs until April 14—the day after the deadline to drop classes without penalty. During her enrollment, CTU suggested to her that her federal financial aid would be sufficient to cover her costs. Upon finding out that CTU had used federal funding as a bait to get her to enroll and that she would have pay out of pocket for some part of it, she immediately asked to be canceled on April 14 and complained that she was "rushed into starting" before she was told that "financial aid" would not cover her full tuition. However, as usual, CTU drew out her cancelation, which extended her last day attended for another two weeks, causing her to incur more tuition fees and eating up more of her federal financial aid. S.B's experience was very typical.

183. Another example is K.P., with whom CTU's recruiters used high-pressure tactics in February 2020 after the potential student told them clearly that she wanted to cancel. CTU's recruiter pestered and belittled K.P's preferred career path and urged her to start class. K.P. had started her enrollment at CTU but wanted to cancel to pursue a career in cosmetology instead, which CTU does not offer. Although K.P. did not incur any additional charges from the all-out effort CTU made to prevent her from canceling and the delay with which CTU processed it, Relator has seen instances in which that has occurred. As CTU's records show, K.P. let her advisor know way back on February 14, 2020, that she was "not prepared nor mentally ready" to go to CTU and did not want to "start college"—she wanted to go to "school for arts." On February 18, 2020, a CTU recruiter promised K.P. in a chat messenger that she would "cancel" her. But three additional requests were made to CTU to process the cancellation, up until February 21, and in the meantime, CTU had two other recruiters (Jacob William and Miguel Gomez) try to convince the student to stay enrolled.

184. One tactic CTU used to keep students enrolled was to mislead them about their status and the impact on their potential debt to the school if they disenrolled. At CTU, a "cancellation" was a student who asked to stop before 15 days and a "withdraw" was a student who asked to stop after the 15 days. Students who cancel before 15 days should not owe any debt to CTU or have their Title IV benefits used.

185.   But CTU would purposefully deceive students about their rights: CTU would send to students who asked to stop before 15 days (and who are "cancel students") the form email and letter that should be sent to a "withdraw student" to make it look like they would get stuck with the costs just like a "withdraw student" would, even though that was not true. Students were lied to and told that if they canceled, they would owe a fee, when the opposite is true.

186.   Even if they are able to successfully cancel or withdraw, students will continue to get calls from CTU and related institutions about re-enrolling. Once enrolled, students are never fully free of CTU's efforts to target them.

C.   **Defendant Schools' Submission of Claims and Statements Certifying Compliance with the Incentive Compensation and Misrepresentation Bans.**

187.   Despite these violations of the Incentive Compensation and Misrepresentation Bans, Defendant Schools continued to certify to the Department of Education that they were fully complying with their obligations under these laws.

188.   Indeed, in each new program participation agreement that Defendant Schools signed during the period in question—and each month they were on a provisional program participation agreement, including following the expiration of the current agreement—Defendant Schools certified, among other things, that that they "will not provide . . . any commission, bonus, or other incentive payment based directly or indirectly on success in securing

enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance."

189. In addition to the certifications they make in the program participation agreements, Defendant Schools also made, or caused to be made, additional certifications as part of their annual compliance audits and as part of the student financial aid process, including but not limited to Required Management Assertions, tens of thousands of G5 Certifications, Master Promissory Notes, and their accompanying school certifications, as described above.

190. In each case, Defendant Schools certified to the Department of Education that they were in material compliance with all Title IV requirements, including the Incentive Compensation and Misrepresentation Bans.

## VII.    **DEFENDANT SCHOOLS' FALSE CLAIMS WERE MATERIAL.**

191. A false statement is material under the False Claims Act if either (1) a reasonable person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it.

192. Materiality is a holistic assessment, including four non-exclusive factors: (1) whether the legal requirement violated is expressly stated in a statute, regulation, or contract, (2) whether the violation goes to the essence of the bargain, (3) whether the violation is significant, as opposed to minor or

insubstantial, and (4) whether the Government has taken action in response to similar, known violations.

### A.    CTU's violations of the ICB are material.

### CTU's Receipt of Title IV Funds Is Triple Conditioned on Compliance with the ICB and CTU Must Demonstrate Compliance to the DOE.

193.    As alleged above, CTU is mandated to comply with the ICB in at least four different ways: (1) it is expressly stated in the statute governing CTU's receipt of student financial aid; (2) it is expressly stated in the DOE's regulations applicable to CTU; (3) it is expressly stated in the contracts (the PPAs) between CTU and the DOE, through which CTU receives Title IV, HEA program funds; and (4) pursuant to the DOE's reporting requirements, CTU's management must annually expressly certify compliance with the ICB.

### Compliance with the ICB Is an Important Part of the Title IV, HEA Programs.

194.    Congress enacted the ICB because incentive compensation payments were associated with high loan default rates, which in turn resulted in a significant drain on program funds. When Congress enacted the ICB, it did so because of evidence of serious program abuses, including the payment of incentive compensation to motivate admissions personnel to enroll students without regard to the students' ability to benefit from the education. S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given

period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

195.    Congress specifically required that the PPAs include the ICB. The DOE did not simply incorporate the ICB into the PPAs by reference, as it did for many other legal requirements. Instead, the DOE included the ICB among the twenty-five specially selected to be set forth in the PPAs in haec verba.

## The ICB Violations Were Systemic and Widespread, Not Minor and Insubstantial.

196.    As alleged above, CTU's violations of the ICB were not isolated, minor, or inconsequential. CTU violated the ICB over many years with respect to every recruiter. Over the years, it is likely that hundreds of employees were paid millions of dollars in impermissible incentive pay.

197.    CTU deliberately and blatantly violated the ICB, intentionally concealing their violations by purporting to consider factors other than enrollment when determining which tier—and therefore what amount of pay— each recruiter earned. CTU's violations were deliberate and intentional.

198.    CTU paid all of its recruiters under the improper incentive compensations system. Even those earning the lowest amounts were affected by CTU's system because they were motivated to enroll greater numbers of students in order to earn more money—precisely what the ICB exists to prevent.

## The Government Has Taken Actions Against Many Schools Found to Have Violated the ICB.

199.   The government has taken enforcement action against other schools who have violated the ICB. *See, e.g., U.S. ex rel. Rose v. Stephens Inst.*, No. 09-CV-05966-PJH, 2016 WL 5076214, at *6 (N.D. Cal. Sept. 20, 2016) (noting that the DOE took action in 25 of the 32 substantiated cases of ICB violations).

200.   In November 2008, the DOE fined a for-profit college $37,000 for violations of the ICB. The DOE stated "Benedictine's violation of th[e ICB] provision, repeated for five years, constitutes a material breach of the school's PPA with the Department."

201.   In February 2014, the DOE fined a for-profit college $40,500 for violations of the ICB. The DOE noted "the [ICB] statute and regulation both place rigid restrictions on the practices of schools with regard to their recruitment and admissions activities. Those restrictions are necessary to prevent abuses observed in the past by the use of 'incentivized' employees, and their enrollment of students through high-pressure sales tactics."

202.   In October 2005, the DOE fined Concordia College $10,000 for violations of the ICB.

203.   In December 2009, the DOE fined a technical college $54,000 for violations of the ICB. The DOE noted that the college "by providing prohibited incentive payments to its admissions or recruiting staff, violated provisions [of

the HEA] that have been enacted to help ensure that only qualified students who have the ability to benefit from the training offered are enrolled."

204.   In October 2020, the Department of Justice settled claims relating to violations of the ICB under the False Claims Act for $225,000 against a private college based in Santee, California. *See* Department of Justice Press Release, 20-1119 (Oct. 19, 2020).

205.   The government has also settled a number of cases under the FCA that were grounded on violations of the ICB. In 2015, the DOE settled an ICB case for more than $95 million. U.S. Dep't of Justice, For-Profit College Company to Pay $95.5 Million to Settle Claims of Illegal Recruiting, Consumer Fraud and Other Violations, Nov. 16, 2015.

206.   In 2009, the DOE recouped more than $67 million for ICB violations in the Hendow case. U.S. Dep't of Justice, University of Phoenix Settles False Claims Act Lawsuit for $67.5 Million, Dec. 15, 2009.

207.   In 2014, the DOE intervened in *United States ex rel. Brooks v. Stevens-Henager Coll., Inc.*, Case No. 2:15-cv-119 (D. Utah), in pursuit of claims alleging the defendant schools violated the ICB. The DOE continues to prosecute that case.

208.   On information, Relator alleges that the DOE has never permitted a school to participate in any Title IV, HEA program or made payments to any school when the DOE had actual knowledge that the school was intentionally

and systematically violating the ICB without also taking other enforcement action against the schools.

209. On information, Relator alleges that the DOE has never entered into a PPA with any school that refused to comply with ICB or stated its intention not to comply with the ICB notwithstanding the representations in the PPA.

**A.      CTU's violations of the Misrepresentation Ban are material.**

**CTU's Receipt of Title IV Funds Is Triple Conditioned on Compliance with the Misrepresentation Ban and CTU Must Attest Compliance to the DOE.**

210. As alleged above, Defendant Schools are mandated to comply with the Misrepresentation Ban in at least four different ways: (1) it is expressly stated in the statute governing CTU's receipt of student financial aid; (2) it is expressly stated in the DOE's regulations applicable to CTU; (3) the contracts (the PPAs) between CTU and the DOE, through which Defendant Schools receive Title IV, HEA program funds, remind CTU of its obligation to comply with Title IV regulations; (4) pursuant to the DOE's reporting requirements, CTU's management must annually report any known misrepresentations.

**Violations of the Misrepresentation Ban Strike at the Heart of the Title IV, HEA Programs.**

211. It is the DOE's position that "[i]nstitutions have a duty, inherent in a fiduciary standard of conduct, to operate in a truthful manner when dealing with students. This duty means that institutions are not allowed to make misrepresentations to students, or prospective students, regarding their

educational programs, the financial charges assessed by the institution, or the employability of its graduates." *In the Matter of Professional Career Training Institute (tx)*, Respondent, Docket No. 19-55-ST, 2020 WL 5250443, at *13 (Department of Education, Office of Hearings and Appeals, Decision of Secretary) (citing 34 C.F.R. §§ 668.71-668.74).

212.    In its March 2011 "Dear Colleague Letter" providing further details about the Misrepresentation Ban, the Department emphasized that the "regulations are intended to make sure that institutions are on notice that the Department believes that substantial misrepresentations constitute a serious violation of an institution's fiduciary duty."

### CTU's Misrepresentation Ban Violations Were Systemic and Widespread, Not Minor and Insubstantial.

213.    As outlined above, violations of the Misrepresentation Ban were part of CTU's business practices—CTU trained its recruiters and others to use misrepresentations in order to recruit students to enroll and prevent them from disenrolling. The misrepresentations took many forms, including telling students they could succeed in classes without the necessary computer equipment and internet access, failing to disabuse students of the many falsehoods told them by CTU's lead generators—everything from promises of thousands of dollars in "free" grant money to promises of job opportunities, leading students to believe that they will receive credits for prior work but never

delivering them, representations about the nature of the programs themselves, and pretty much everything else.

214.    CTU's violations were not isolated or minor—they were perpetrated every day by nearly every recruiter against nearly every student and prospective student. The violations have affected literally thousands of students.

215.    The violations of the Misrepresentation Ban are baked into CTU's business model—CTU seems unable to operate without systematically misleading students and prospective students.

## The Government Has Taken Actions Against Many Schools Found to Have Violated the Misrepresentation Ban.

216.    The Department and other federal government agencies have consistently enforced the ban on misrepresentations in the past decade, bringing a number of enforcement actions.

217.    For example, the DOE imposed $60,000 in fines to a small college for violations of the Misrepresentation Ban in *In the Matter of Teddy Ulmo Institute, Respondent*, Docket No. 03-42-SF, 2005 WL 8132040 (Department of Education, Office of Hearings and Appeals, Decision of Secretary).

218.    In particularly egregious cases, the DOE has sought and obtained a school's termination from all Title IV, HEA programs due to its violations of the Misrepresentation Ban. *See In the Matter of Professional Career Training Institute (tx), Respondent*, Docket No. 19-55-ST, 2020 WL 5250443 (Department of

Education, Office of Hearings and Appeals, Decision of Secretary) (citing 34 C.F.R. §§ 668.71-668.74).

219.   The DOE has also terminated a school and levied penalties of $100,000 against it in connection with the school's violations of the Misrepresentation Ban. *See In the Matter of Yorktowne Business Institute*, 85 Ed. Law Rep. 1265, 1993 WL 591773 (Department of Education, Office of Hearings and Appeals).

220.   The DOE has taken other enforcement actions against schools violating of the Misrepresentation Ban as well.

## VIII.   **CTU ACTED WITH THE REQUIRED KNOWLEDGE: SCIENTER**

221.   The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b).

### A.   **ICB.**

222.   CTU and its parent company are keenly aware of the ICB. Todd Nelson, the former chief executive officer of Perdoceo, previously served as the chief executive officer of Education Management Corporation, the former owner

of the now-defunct Dream Center schools, during a period when whistleblowers accused the company of violating the ICB.

223. CTU's parent company, CEC, admitted knowing in 2011 that "[i]n October 2010, ED [the Department of Education] issued new regulations pertaining to certain aspects of the administration of the Title IV Programs, including, but not limited to … compensation for persons and entities engaged in certain aspects of recruiting, admissions and student financial aid."

224. Furthermore, when the ICB regulations were finally comprehensively revised in 2011 to strengthen the ICB's protections, CTU's parent company, CEC (Perdoceo's predecessor) acknowledged that "[a]n institution participating in Title IV Programs cannot provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or Title IV financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." CEC further acknowledged that the "[n]ew regulations issued in October 2010 which became effective July 1, 2011" should have caused CTU to "change[] the pay practices for [admissions representatives]."

225. As Perdoceo has acknowledged, "[i]n September 2016, the Department's Office of Inspector General released a revised audit guide

applicable specifically to for-profit schools that requires an annual audit to review compliance with the incentive compensation restrictions."

226. Perdoceo has also admitted knowing that violating the ICB is considered material by the DOE, stating that if "the Department determine[s] that an institution's compensation practices violated these standards, the Department c[an] subject the institution to substantial monetary fines, penalties or other sanctions."

## B.    **Misrepresentation Ban.**

227. As noted above, when the Title IV, HEA program regulations were significantly overhauled in 2011, CTU's parent company, CEC, admitted that "[a]mong the most significant regulatory changes that we have identified for our business" included "changing the definition of 'substantial misrepresentation' to include, among other things, erroneous statements, including erroneous statements made by certain third-party vendors under contract to an institution."

228. Indeed, CTU's parent company admitted that the new "misrepresentation rules may adversely affect our student recruiting and marketing efforts."

229. Perdoceo admits knowing about the pertinent aspects of the Misrepresentation Ban, noting that

> [t]he Higher Education Act prohibits an institution participating in Title IV Programs from engaging in

substantial misrepresentation of the nature of its educational programs, financial charges, graduate employability or its relationship with the Department. Under the Department's rules, a "misrepresentation" is any statement (made in writing, visually, orally or otherwise) made by the institution, any of its representatives or a third party that provides educational programs, marketing, advertising, recruiting, or admissions services to the institution, that is false, erroneous or has the likelihood or tendency to deceive, and a "substantial misrepresentation" is any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment. Considering the broad definition of "substantial misrepresentation," it is possible that, despite our training efforts and compliance programs, our institutions' employees or service providers may make statements that could be construed as substantial misrepresentations. If the Department determines that one of our institutions has engaged in substantial misrepresentation, the Department may revoke the institution's program participation agreement, deny applications from the institution for approval of new programs or locations or other matters, or initiate proceedings under its borrower defense to repayment regulations to fine the institution or limit, suspend, or terminate its eligibility to participate in Title IV Programs; the institution could also be exposed to increased risk of action under the Federal False Claims Act.

(2020 Annual Report).

## IX.   CTU'S SUBMISSION OF FALSE CLAIMS CAUSED DAMAGE TO THE US GOVERNMENT

230. Every request for a federal grant, every request for a loan under FDLP, every interest payment on a subsidized Stafford Loan, and every

government payment on a loan made on behalf of a student attending Defendant Schools constitutes a separate false claim.

231.  As detailed below, a large percentage of CTU's students rely on Title IV programs funding, which account for a large percentage of CTU's revenues each year.

232.  Each grant award, disbursement of FDLP loans, and government repayment of loan interest or defaulted loan principal was caused by Defendant Schools' false certifications and statements in the PPAs, compliance audit Management Assertions, G5 Certifications, MPNs, school certifications, and other documents that CTU was in compliance with the ICB and Misrepresentation Ban and were therefore eligible to receive Title IV funding. CTU made these false certifications and statements despite the fact that it had actual knowledge of their falsity. Each request for payment constitutes a false claim under the FCA.

### A.    **Defendant Schools' Receipt of Title IV Funding.**

233.  CTU and its parent companies have received a substantial amount of money from the federal government through Title IV funding.

234.  According to Perdoceo, "[a] substantial majority of [its] students rely on Title IV Programs to assist in financing their education, and [Perdoceo and CTU] derive a substantial majority of [their] revenue and cash flows from Title IV Programs."

235.   For the year ended December 31, 2016, approximately 87% of all CEC students who were in a program of study at any date during that year participated in Title IV Programs, which resulted in Title IV program cash receipts to CEC o of approximately $510 million. education. As of December 31, 2016, students enrolled at CTU represented approximately 60% of CEC's total enrollments.

236.   For the year ended December 31, 2017, approximately 86% of all CEC students who were in a program of study at any date during that year participated in Title IV Programs, which resulted in Title IV program cash receipts to CEC of approximately $441 million.

237.   For the year ended December 31, 2018, approximately 83% of all CEC students who were in a program of study at any date during that year participated in Title IV Programs, which resulted in Title IV program cash receipts to CEC of approximately $435 million. As of December 31, 2018, students enrolled at CTU represented approximately 66% of CEC's total enrollments.

238.   For the year ended December 31, 2019, approximately 81% of all Perdoceo students who were in a program of study at any date during that year participated in Title IV Programs, which resulted in Title IV program cash receipts to Perdoceo of approximately $436 million.

239.    For the year ended December 31, 2020, approximately 74% of all Perdoceo students who were in a program of study at any date during that year participated in Title IV Programs, which resulted in Title IV program cash receipts to Perdoceo of approximately $525 million. As of December 31, 2020, students enrolled at CTU represented approximately 58% of Perdoceo's total enrollments.

240.    For the year ended December 31, 2021, approximately 78% of all Perdoceo students who were in a program of study at any date during that year participated in Title IV Programs, which resulted in Title IV program cash receipts to Perdoceo of approximately $550 million. As of December 31, 2021, students enrolled at CTU represented approximately 68% of Perdoceo's total enrollments.

241.    For the year ended December 31, 2022, a majority of all Perdoceo students who were in a program of study at any date during that year participated in Title IV Programs, which resulted in Title IV program cash receipts to Perdoceo of approximately $511 million. As of December 31, 2022, students enrolled at CTU represented approximately 64% of Perdoceo's total enrollments.

## X.    <u>CTU VIOLATED THE FALSE CLAIMS ACT'S ANTI-RETALIATION PROVISION.</u>

242.    Before Relator started voicing any concerns to CTU's management about the issues identified above and many others, CTU's management treated

him very well—they made sure he had a constant flow of leads and he was given a "long leash" in terms of how he performed his job. While the people who were not enrolling a lot of students were micromanaged and constantly were left to fend for themselves, Relator was treated well—which recruiters called "getting fed"—because he enrolled lots of students. For many years, Relator was a well-rewarded, successful recruiter and retention expert.

243. CTU's management began treating Relator very differently as soon as he started raising concerns about the way CTU recruited students. Once he raised concerns, the way CTU's management treated Relator changed immediately, and it was a night-and-day difference for Relator in performance reviews, call observations, and the leads he was provided.

244. When Relator went to management with his concerns, he was told "this is a for profit college. If you want to work with a college that cares more about setting students up right and that is not solely focused on enrolling students, you should work in admissions in a nonprofit college or public college." Members of management would say they were speaking to Relator "as a friend and not a manager" when they said that Relator "cared too much and perhaps should look at a different job."

245. After the court-appointed monitor was named to make sure that the deceptive practices alleged in a multistate settlement (from January of 2019) had stopped, CTU's management told the recruiters to be aware that they had access

to theirr calls and could listen to what they wanted. Relator remembers hoping this would lead to positive changes in the way CTU trained them to recruit students. If anything, after these settlements were announced, CTU managed to become even more deceptive and toxic. There were jokes among the recruiters about how CTU settled these lawsuits but hadn't changed a thing. Relator cannot remember a single moment when any of this has been taken seriously by CTU.

246.    Eventually, after Relator attempted repeatedly in good faith to insist that CTU live up to its commitments to abide by the settlement agreement, which included promises to cease the very practices that CTU required Relator to continue to engage in and some of which are identified above, Relator could no longer continue to work for CTU. Relator finally understood that in order to continue to be employed by CTU, he would be forced to engage in the very practices identified above. He could not, in good conscience, continue to do so, and no reasonable employee would do so either. Relator was constructively discharged on November 24, 2020.

XI.    **CLAIMS FOR RELIEF.**

## CLAIM I

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(A) (2009)  -  False Claims Regarding Compliance
With Title IV  --  Against All Defendants)

88

247. Relator re-alleges and incorporates herein paragraphs 1 through 246.

248. From at least June 2016 to the present, Defendant Schools knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A). Specifically, Defendant Schools knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs, G5 Certifications, and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV programs and receive Title IV funding, when, in fact, Defendant Schools' practices did (and do) not comply with Title IV of the HEA and its associated regulations. In submitting or causing to be submitted such certifications and applications, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

249. These fraudulent representations were material to the Department of Education's decision to make Defendant Schools eligible for these financial aid programs and to pay funds under Title IV programs. Therefore, Defendant Schools fraudulently induced the Department of Education to make Defendant Schools eligible to participate in the Title IV programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA.

250.    The fact that compliance with the Incentive Compensation Ban was material to the government's decision to make payments under Title IV programs, combined with the fact that Defendant Schools, knowing that they were in violation of the Incentive Compensation and Misrepresentation Bans and therefore ineligible to receive such student financial aid, submitted claims for student financial aid, caused students to submit claims for student financial, and/or received such aid, makes Defendant Schools liable under the FCA.

251.    In submitting or causing to be submitted such claims, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

252.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

### CLAIM II

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(B) (2009) - False Statements and Records Regarding Compliance with Title IV -- Against All Defendants)

253.    Relator re-alleges and incorporates herein paragraphs 1 through 246.

254.    From at least June 2016 to the present, Defendant Schools knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). Specifically, Defendant Schools knowingly made, used, and caused to be made

or used, false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs, G5 Certifications, and annual compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV programs and to receive Title IV funding, when in fact, Defendant Schools' practices did not comply with Title IV of the HEA and its associated regulations.

255.    In making, using, or causing to be made or used such false records and statements, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

256.    These false records and statements were material to the Department of Education's decision to make Defendant Schools eligible for these financial aid programs and to pay funds under Title IV programs. Defendant Schools fraudulently induced the Department of Education to make Defendant Schools eligible to participate in the Title IV programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA.

257.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

**CLAIM III**

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**

(31 U.S.C. § 3730(h)  -  Violations of the Anti-Retaliation Provision  -- Against All Defendants)

91

Retaliation under the False Claims Act

258. Relator re-alleges and incorporates herein paragraphs 1 through 246.

259. Relator engaged in protected activity when he repeatedly and vocally raised objections to the practices identified in this Complaint. Relator's efforts to stop CTU's violations was protected activity under the federal False Claims Act's anti-retaliation provision.

260. CTU violated the anti-retaliation provision by making Relator's professional life unbearable and intolerable in direct response to Relator's efforts to stop the violations identified in this Complaint. 31 U.S.C. § 3730(h).

261. Relator has suffered damages as a direct and proximate result of Defendant Schools' violations of the anti-retaliation provision, including, but not limited to, damages for emotional distress.

**PRAYERS FOR RELIEF**

WHEREFORE, Relator, on behalf of himself and the United States, demands and prays that judgment be entered in their favor against Defendant Schools, as follows:

262. On Claims I and II, for triple the amount of the United States' damages plus interest and such civil penalties as are allowable by law, together with the costs of this action and such other and further relief as may be just and proper;

263.    That judgment be entered in favor of Relator and the United States and against the Defendant Schools for actual damages, pre-judgment and post-judgment interest, litigation costs, investigative costs, disgorgement of all profits, and an accounting, to the fullest extent as allowed by law, and for such further relief as may be just and proper;

264.    That Relator be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730;

265.    That to the extent the United States Government has intervened in this action, the Relator be awarded an amount of at least 15% but not more than 25% of the proceeds of any award or the settlement of the intervened claims;

266.    That to the extent that the United States Government has not intervened in this action, the Relator be awarded an amount that the Court decides is reasonable, which is not less than 25% nor more than 30% of the proceeds of any award or settlement of the non-intervened claims;

267.    On Claim III, for compensation for the lost income, the special damages sustained, together with the costs of this action; and

268.    For an award of all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(h)(2);

269.    For any other relief the Court deems just and equitable.

## XII.  **JURY TRIAL DEMAND**

270.  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a jury trial.

DATED this 13th day of November 2023.

BRANDON J. MARK
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: bmark@parsonsbehle.com

*Attorneys for Relator*